IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| In the Matter of the Search of Information Associated with w***********1@gmail.com That is Stored at Premises Controlled by Google, Inc., | ) ) ) ) ) ) |
| In the Matter of the Search of A Wireless Telephone Assigned Telephone Number (615) ***-****, Believed to Be Used by William Andrew Ogles, | ) ) ) ) ) ) ) |
| U.S. Representative William Andrew Ogles, in both his official capacity as a Member of the U.S. House of Representatives, and his individual capacity, | ) ) ) ) ) ) ) ) |
| Movant. | ) ) |

Case No. 24-mj-4250, 24-mj-4276

Magistrate Judge Alistair Newbern

**EVIDENTIARY HEARING
REQUESTED**

## EMERGENCY MOTION FOR RETURN OF PROPERTY
## AND MEMORANDUM IN SUPPORT

Pursuant to Fed. R. Crim. P. 41(g) and U.S. CONST. art. I, § 6, cl. 1,
U.S. Representative William Andrew ("Andy") Ogles moves this Court to order the
Executive Branch to return privileged legislative materials contained on his cell
phone and email account seized as part of the above-captioned search warrants.

## INTRODUCTION

Andy Ogles serves in the 118th Congress of the United States, representing
the Fifth District of Tennessee in the House of Representatives. As a member of
Congress, his "business . . . is to legislate." *Doe v. McMillan*, 412 U.S. 306, 324 (1973).
But that business was interrupted on August 2, 2024, when the Executive Branch,

acting through the Federal Bureau of Investigation ("FBI"), seized his cell phone and the contents of his email account. These items contain communications reflecting legislative acts of the most sensitive character—including confidential debate among dozens of Representatives about who should lead the House as Speaker.

Congressman Ogles brings this motion to demand the return of privileged legislative materials. He does not seek the return of any other data.

Judicial intervention under Rule 41(g) is necessary because the Executive Branch will not comply with the Constitution on its own. When Congressman Ogles demanded that the FBI allow him to remove the legislative materials from the seized phone and email account—leaving the FBI with the rest—the relevant officials refused. In the view of the Department of Justice, the Executive has the power and prerogative to read and review even the most sensitive legislative correspondence between Members of Congress, so long as that correspondence is caught up in a dragnet of the Executive's creation.

This view is wrong—and dangerously so. The Speech or Debate Clause "insure[s] that the legislative function the Constitution allocates to Congress may be performed independently." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975). The "central role" of the Clause—which "reinforc[es] the separation of powers"—is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *United States v. Johnson*, 383 U.S. 169, 181 (1966). Both dangers are present here.

Allowing the Executive Branch to examine confidential communications between Members of Congress about essential legislative matters, including the internal operations of Congress, endangers the constitutional scheme. Just as "Congressional subpoenas [seeking] information from the President . . . implicate special concerns regarding the separation of powers," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020), so too do Executive seizures of Congressional documents. The search warrants here ignored the fact that the targeted property belonged to a Member of Congress and inevitably contained materials documenting, effecting, and performing the Member's legitimate legislative acts.

The actions by the Executive Branch here are troublesome because even its own prosecutors admit that they do not have substantial evidence linking Congressman Ogles to the commission of a crime. Left unchecked, there would be nothing to stop determined Executive Branch officials from undermining Congressional independence by seizing and examining the legislative communications of Members under the guise of search warrants directed at wrongdoing by third parties or at putative crimes that did not occur.

To prevent such abuse, the Constitution demands that the Court permit Members of Congress to prevent the disclosure of privileged legislative materials to the Executive Branch. Because Congressman Ogles was not afforded that opportunity when the warrants in this case were executed, the Court should order that his legislative materials be returned to him promptly, without review by the Executive.

3

## FACTUAL BACKGROUND

1.      Andy Ogles represents Tennessee's Fifth Congressional District in the House of Representatives. Exhibit 1: Declaration of Congressman Andy Ogles ("Ogles Decl.") at ¶ 2. He is a member of the Republican Party. *Id.* at ¶ 4. In 2022, after a contested primary, he won the general election. *Id.* at ¶ 3.

2.      On January 3, 2023, Representative Ogles assumed office as a member of the 118th Congress, in which the Republican Party held a 222 to 213 seat majority. *Id.* at ¶ 5.

3.      From almost the moment he was elected to office, Congressman Ogles used the cell phone and email account at issue here to communicate about sensitive legislative issues. *Id.* at ¶ 7.

4.      For example, in the initial election for Speaker of the House, Congressman Ogles joined fellow members of the House Freedom Caucus in opposing California Congressman Kevin McCarthy through multiple rounds of voting. Liam Adams, *US Rep.-elect Andy Ogles opposes McCarthy's speakership bid joining other hardline conservatives*, Tennessean (January 4, 2023, 3:45 PM).

5.      Members of the caucus opted to vote for Congressman Jim Jordan and former President Donald Trump as Speaker, among others, continuing their opposition until Congressman McCarthy agreed to several demands on the House rules package, including a one-member threshold for calling for an ouster of the Speaker. Lexie Schapitl, *House rules changes breeze through the chamber following a*

4

*bitter speaker fight*, NAT'L PUB. RADIO (January 9, 2023, 7:33 PM). The House later ousted McCarthy from the position.

6. On October 25, 2023, House lawmakers elected Louisiana Representative Mike Johnson as the 56th Speaker of the House to replace McCarthy, capping more than three weeks of debate and 15 rounds of balloting. Lisa Mascaro, *Mike Johnson, a staunch Louisiana conservative, is elected House speaker as GOP moves past chaos*, ASSOCIATED PRESS (October 25, 2023, 5:00 PM).

7. The communications that reside on Congressman Ogles' phone and in his email account include confidential communications with Members of Congress and staff about both of these internal House elections for Speaker. Ogles Decl. at ¶ 7.

8. Other examples of legislative activity that reside on Congressman Ogles' phone and email account are communications about legislation he introduced in response to the pro-Palestinian protests on university campuses following the attack on Israel by Hamas on October 7, 2024. Ross O'Keefe, *Republican House members suggest laws sending campus protesters to Gaza*, WASH. EXAMINER (May 8, 2024, 3:44 PM).

9. That piece of legislation is but one of many with which Congressman Ogles was actively engaged. During his term, Congressman Ogles submitted a record-breaking one hundred legislative proposals. Kaitlin Housler, *Tennessee U.S. Rep. Andy Ogles Breaks Records Upon Introducing 100th Piece of Legislation*, TENN. STAR (April 15, 2024). This marked the second-highest number of proposals among all current members of the House of Representatives. *Id.*

10.     Of his legislative proposals, thirty-seven have been passed by the House, and three have been signed into law already. *Id.* This was the highest number of standalone pieces of legislation enacted among all freshman Members of Congress.

11.     In addition, Congressman Ogles introduced the Inflation Reduction Act of 2023, which aimed to repeal the previous year's Inflation Reduction Act. Manuel Quinones, *Republicans unveil Inflation Reduction Act repeal bill,* POLITICO (February 6, 2023, 6:22 AM). President Biden mentioned the bill unfavorably in his State of the Union address, although without identifying Congressman Ogles by name. *President Biden's State of the Union Address*, THE WHITE HOUSE (February 7, 2023), https://www.whitehouse.gov/state-of-the-union-2023/.

12.     In his short time in office, Congressman Ogles has co-authored legislation with several Senators, including Republicans Ted Cruz of Texas, Mike Lee of Utah, Rand Paul of Kentucky, Steve Daines of Montana, and others on multiple occasions. *Representative Andrew Ogles*, LIBRARY OF CONGRESS, https://www.congress.gov/member/andrew-ogles/O000175.

13.     From the time Congressman Ogles was elected as a member of the 118th Congress, including during the events surrounding the elections of Speaker McCarthy and Speaker Johnson, and while he crafted the legislation described above, he communicated privately with fellow Congressmen, Senators, former President Trump, legislative staff, and constituents using the cell phone and email accounts at issue here, including through text messages and email. Ogles Decl. at ¶ 17.

14.     The Department of Justice is part of the Executive Branch of the federal government and is led by Attorney General Merrick Garland, who was appointed by President Joe Biden. *Attorney General Merrick B. Garland*, JUST. DEP'T, https://www.justice.gov/ag/staff-profile/meet-attorney-general. President Biden is the leader of the Democratic Party. Stephen Ohlemacher, *Biden formally clinches Democratic presidential nomination*, ASSOCIATED PRESS (June 5, 2020, 11:02 PM).

15.     The Federal Bureau of Investigation ("FBI") is the principal law enforcement agency within the Executive Branch. As a component of the Department of Justice, its officials report to Attorney General Garland.

16.     The U.S. Attorney for the Middle District of Tennessee is Henry Leventis, who also serves under Attorney General Garland and was appointed by President Joe Biden. *United States Attorney Henry C. Leventis*, U.S. ATTORNEY'S OFFICE, https://www.justice.gov/usao-mdtn/meet-us-attorney.

17.     On July 12, 2024, prosecutors working under the direction of both Attorney General Garland in Washington, D.C., and U.S. Attorney Leventis in Nashville obtained a search warrant  to be served on Google for information associated with Congressman Ogles' personal email account ("Email Warrant") for the period from January 1, 2022 to the present—a period that includes his present term in Congress.

18.     On July 30, 2024, those same prosecutors sought a second search warrant, this time for Congressman Ogles' cell phone ("Phone Warrant").

7

19.     On August 2, 2024, the FBI executed the Phone Warrant at Congressman Ogles' residence in Maury County, Tennessee and took possession of his cell phone. After doing so, the Department of Justice notified counsel for Congressman Ogles that the FBI also had collected, but had not yet accessed, the Representative's personal email account, which resided on Google's servers. Exhibit 2: Declaration of John Rowley, Congressman Ogles' Counsel ("Rowley Decl.") at ¶ 5.

20.     After the FBI took possession of the cell phone, counsel for Congressman Ogles explained to Department of Justice representatives that the cell phone and email account seized pursuant to the Email and Phone Warrants contain privileged legislative materials. *Id.* at ¶ 6.[1]

21.     Given the presence of such materials, Congressman Ogles requested that the Department of Justice allow him to review the data on his cell phone and email before they were accessed by Executive Branch officials so he and his counsel could identify and remove legislative materials in accordance with the procedures required by the D.C. Circuit's decisions in *United States v. Rayburn House Off. Bldg., Room 2113, Washington, D.C. 20515* ("*Rayburn*"), 497 F.3d 654, 660 (D.C. Cir. 2007) and *In re Sealed Case (Perry)*, 80 F.4th 355 (D.C. Cir. 2023). Rowley Decl. at ¶ 7.

22.     The Department of Justice refused, asserting that it had no such obligation. *Id.* at ¶ 8. In its view, Executive officers could review *all* the information seized by the Phone and Email Warrants using a "taint team," even if that

---

[1]     "Legislative materials," as used in this motion, refers to communications protected by the Speech or Debate Clause, including, but not limited to text messages and emails.

information ultimately was deemed legislative material. *Id.* But Department officials "agreed not to review the contents of Rep. Ogles' cellphone and Google account until a magistrate or district judge of the Middle District of Tennessee rules on Ogles' motion." *Id.* at ¶ 9.

23.   Last week, the same prosecutors described Congressman Ogles as a "subject" rather than a "target" of their investigation. *Id.* at ¶ 10.

24.   Under longstanding Department of Justice policy, "a 'target' is a person as to whom the prosecutor . . . has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." JUST. MANUAL § 9-11.151 (2023). A "subject," on the other hand, is merely "a person whose conduct is within the scope of the grand jury's investigation." *Id.* at 11.

## JURISDICTIONAL STATEMENT

Federal Rule of Criminal Procedure 41(g) establishes a procedure for the return of unlawfully seized property. When, as here, there is no criminal proceeding pending against the movant, a Rule 41(g) motion is treated as a civil proceeding invoking the court's equitable powers. *See, e.g.*, *Search of Music City Mktg., Inc.*, 212 F.3d 920, 923 (6th Cir. 2000). The Court must exercise its equitable jurisdiction to hear a Rule 41(g) motion when the movant shows he will suffer irreparable harm and there is no adequate remedy at law. *Brown v. United States*, 692 F.3d 550, 553 (6th Cir. 2012).

9

Here, the irreparable harm is clear. If the legislative materials are not returned before Executive officials review them, Congressman Ogles' rights under the Speech or Debate Clause will have been permanently violated and cannot be repaired by an action at law or damages—or any other traditional relief. *See Rayburn*, 497 F.3d 664-66. In this context, the immediate return of the legislative materials is the only remedy that vindicates the separation of powers principles underlying the Clause. *Id.* In addition, because there is no ongoing criminal proceeding against Congressman Ogles, nor is there likely to be one because no crime was committed, there is no other route to secure the return of these constitutionally protected materials. *See In re Sealed Case* ("*Perry*"), 80 F.4th 355, 362 (D.C. Cir. 2023) (asserting jurisdiction in analogous circumstances).

This Court should exercise its equitable jurisdiction and address the substance of the matter: that the Executive Branch has no right to rummage through Congressman Ogles' legislative materials, and they must be returned.[2]

---

[2] Congressman Ogles requests an evidentiary hearing on this motion. *See Savoy v. United States*, 604 F.3d 929, 933 (6th Cir. 2010) ("We have held that Rule 41(g) clearly contemplates a hearing on any issue of fact necessary to the decision of the motion."). Undersigned counsel will work with opposing counsel to stipulate to as many facts as possible to limit or eliminate contested factual issues.

## ARGUMENT

The Speech or Debate Clause protects Members of Congress ("Members") from intrusion by the Executive and Judicial Branches. Among its protections, the Clause prevents Executive Branch agents from compelling legislators or their aides to disclose legislative materials. The purpose of this protection is grounded in the Separation of Powers: the open exchange of views between Members would be chilled if Executive officials were allowed to review their correspondence.

When Executive officials seek, and the Judicial Branch issues, a search warrant against a Member that might encompass documentary evidence of legislative acts, such as communications between Members about legislative matters, the Member has the right to block the disclosure of such materials.

Congressman Ogles' phone and email account—the targets of the search warrants at issue here—contain large quantities of legislative material protected from disclosure under the Speech or Debate Clause. This is no surprise, as these are both locations where communications by Members about legislative matters are inevitably found and have been found in prior cases involving legislative privilege.

Still, the warrants here seek Congressman Ogles' privileged communications while providing no adequate procedures to protect his rights under the Speech or Debate Clause. This is unconstitutional. Under the Clause, the seized data should be removed from the custody of Executive officials. Congressman Ogles and his counsel can then review it and provide the data to the Court, so the Court can supervise the

11

removal of the privileged materials, return the remaining data to the Executive Branch, and adjudicate any disputes over the privilege.

**I.    The Speech or Debate Clause Prohibits Disclosure of Legislative Materials to the Executive Branch.**

"[A] search that allows agents of the Executive to review privileged [legislative] materials without the Member's consent violates the [Speech or Debate] Clause." *Rayburn*, 497 F.3d at 663; *Schilling v. Speaker of U.S. House of Representatives*, 633 F. Supp. 3d 272, 279 (D.D.C. 2022) ("[L]egislators and their aides have absolute immunity from compelled disclosure or testimony related to legislative activities.") That is because, "at the very least," the Clause protects a member of Congress "from criminal or civil liability and from questioning elsewhere than in [Congress]." *Gravel,* 408 U.S. at 615. The Executive cannot avoid the bar on questioning members of Congress about their legislative acts simply by seizing documentary evidence of those acts "elsewhere."

This protection is a "deceptively simple" takeaway from the plain text of the Clause, *see Rayburn*, 497 F.3d at 660, which confers three "absolute" protections to Members of Congress. *See Eastland*, 421 U.S. at 509. First, it provides Members with immunity from a lawsuit or criminal prosecution for legislative acts. *Id.* at 502. Second, the Clause creates an evidentiary privilege, which bars the introduction of evidence of legislative acts. *Johnson*, 383 U.S. at 176-77. Third, the Clause explicitly guarantees that a Member of Congress will not "be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1.

The third category of protection applies here. And it has two components: a testimonial bar, *Gravel*, 408 U.S. at 616, and a bar on the compelled disclosure of legislative documents, *Perry*, 80 F.4th at 365; *Rayburn*, 497 F.3d at 663; *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418 (D.C. Cir. 1995). The testimonial privilege prevents Department of Justice officials from hauling a Member of Congress into a grand jury (or elsewhere) to compel him to talk about legislative acts. *Gravel*, 408 U.S. at 616. And the disclosure bar prevents the same injury from occurring in "any other Place," which might occur if evidence of the same legislative acts resided (for example) in the Congressman's physical office or on his cell phone. *See Brown & Williamson Tobacco Corp.*, 62 F.3d at 420 ("Documentary evidence can certainly be as revealing as oral communications," providing "clues as to what Congress is doing, or might be about to do.") Just as "[r]evealing information as to a legislative act . . . to a jury would subject a Member to being 'questioned' in a place other than the House or Senate," *Helstoski*, 442 U.S. at 490, so too would examining Congressional documents about those acts "impermissibly expos[e Congressional] deliberations to executive influence," *Gravel*, 408 U.S. at 625. *Accord Perry*, 80 F.4th at 364 ("Just as the other branches may not compel verbal testimony concerning legislative acts, they may not force Members to hand over documentary evidence of those acts.")

The plain language of the Clause supports a non-disclosure privilege for legislative materials. "The Clause does not simply state, 'No proof of a legislative act shall be *offered*'; the prohibition of the Clause is far broader. It provides that

Members 'shall not be *questioned* in any other Place.'" *Helstoski*, 442 U.S. at 489 (emphasis in original). In other words, "the immunity from suit" that Members enjoy "derives from the testimonial privilege, not the other way around." *Brown & Williamson Tobacco Corp.*, 62 F.3d at 418. So the greater privilege the Clause provides is against Members being "questioned," and that protection extends outside the courtroom to "any other Place." U.S. CONST. art. I, § 6, cl. 1.

The key term "questioned" must be read "broadly" to effectuate the purposes of the Speech or Debate Clause. *Johnson*, 383 U.S. at 180. Quite simply, "[a] question is a request for information," *Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives ("SEC")*, 161 F. Supp. 3d 199, 242 (S.D.N.Y. 2015), and a search warrant constitutes the most intrusive way the Executive can demand information from a target of its scrutiny, *see, e.g., Johnson v. United States*, 333 U.S. 10, 14 (1948) (explaining that search warrants permit officers "to thrust themselves into a home"); *Berger v. New York*, 388 U.S. 41, 63-64 (1967) (allowing electronic eavesdropping if officers obtain a warrant); *Beylund v. N. Dakota Dep't of Transp.*, 579 U.S. 438, 476 (2016) (acknowledging the same for compelled blood tests).

Whether an Executive subpoena seeks oral testimony from a Member concerning a legislative act or an Executive officer seizes written documents that fall "within the sphere of legitimate legislative activity," *Gravel*, 408 U.S. at 624 (cleaned up), the distinction is "immaterial under the Speech or Debate Clause." *SEC*, 161 F. Supp. 3d at 242 (applying the same comparison when upholding a non-disclosure bar to quash Executive Branch subpoenas). Both actions have the same

14

impermissible effect, which is exposing privileged Congressional information. *Helstoski*, 442 U.S. at 491 (describing "the central importance of the Clause" as "preventing intrusion by Executive and Judiciary into the legislative sphere").

A seizure of "legislative act" documents pursuant to a search warrant is contrary to the plain language of the Clause, which—as the Supreme Court has repeatedly recognized—speaks in absolute terms. *See Eastland*, 421 U.S. at 503 ("[O]nce it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference."); *McMillan*, 412 U.S. at 324 ("The business of Congress is to legislate; Congressmen and aides are absolutely immune when they are legislating."); *see also Brewster*, 408 U.S. at 516 ("[T]he Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander and even destroy others with impunity.")

Ultimately, the bar on disclosure "prevent[s] intrusion by [the] Executive and Judiciary into the legislative sphere," which was a primary rationale for the Clause. *Helstoski*, 442 U.S. at 491. The Clause "ensures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation." *Powell v. McCormack*, 395 U.S. 486, 503 (1969). The disclosure bar furthers both these practical ends. *See Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979) (noting that the "Court has given the Clause a practical, rather than a strictly literal, reading").

Consider the alternative. Allowing the Executive to read and review legislative documents like correspondence between Members of Congress would chill the frank

exchange of views between Members. There is little doubt that "exchanges between a Member of Congress and the Member's staff or among Members of Congress on legislative matters may legitimately involve frank or embarrassing statements." *Id*. By asserting the right to read and review such statements captured in documentary form, the Executive "threaten[s] the integrity or independence of [Congress] by impermissibly exposing its deliberations to executive influence." *Gravel*, 408 U.S. at 625. The "chill" imposed by such disclosure "runs counter to the Clause's purpose of protecting against disruption of the legislative process." *Rayburn*, 497 F.3d at 661. At the very least, such a demand by the Executive to review confidential legislative materials poses an impermissible "threat to legislative independence." *Gravel*, 408 U.S. at 621. *See, e.g.*, Exhibit 3: Amicus Brief of the House in *Perry* at 8.

Without a non-disclosure privilege, Members of Congress would lack meaningful protections against potential abuses by the Executive Branch. "The paradigmatic abuse against which the Clause protects is an executive-branch official harassing a legislator and that harassment influencing the legislator's vote, thus frustrating democratic representation." Ethan L. Carroll, *Note, The Institutional Speech or Debate Protection: Nondisclosure as Separation of Powers*, 63 DUKE L. J. 1153 (2014). No less an authority than then-Attorney General Robert Jackson has warned that, with so many laws on the books, "law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." Robert H. Jackson, U.S.

Attorney Gen., *The Federal Prosecutor, Address at the Second Annual Conference of United States Attorneys* (Apr. 1, 1940), *in* 24 J. AM. JUDICATURE SOC'Y 18, 19 (1940). Members of Congress are uniquely susceptible to both harassment and prosecution by the Executive because they often find themselves standing in the way of the Executive's prerogative.

The actions by the Executive Branch in this case demonstrate how both the harassment and bias dangers can arise. As to the first, the scope of the search warrants and the way the Executive Branch executed them permit the conclusion that the Executive's officers necessarily understood that they would capture and review legislative materials and thereby purposely intrude upon private Congressional affairs.

The facts are concerning. Executive officials knew that legislative materials often reside on the personal cell phones of individual Members of Congress. *Perry*, 80 F.4th 366 n.6 (rejecting the Executive's view that phones cannot contain evidence of legislative acts). And they surely knew (or easily could have confirmed by reviewing toll records) that Congressman Ogles regularly spoke and corresponded with other Members of Congress on the phone seized by the Phone Warrant. Despite this knowledge, they did not try to protect Congressional correspondence or other legislative materials from disclosure. More than a decade after *Rayburn*, federal prosecutors can easily follow a protocol that shields privileged material from Executive review. Federal prosecutors did so less than two years ago when they seized another Member's cell phone. *Id.* at 360. And yet the search warrants here

provided even less protection for the legislative materials within Congressman Ogles' cell phone and email account than the search warrant for the documents within the Congressional Office at issue in *Rayburn*. 497 F.3d at 656-57 (describing precautions the Department took to protect legislative materials).

Nor did the prosecutors or agents here take any *other* steps to prevent the review of legislative materials by the Executive Branch. For example, prosecutors refused to limit the seizure of records to those created before Congressman Ogles was elected to Congress. If this were a legitimate investigation into issues with campaign finance disclosures, the Executive would not have needed to review correspondence *after* that campaign concluded and candidate Ogles became Representative Ogles. Still, prosecutors sought records for more than a year and a half into the Congressman's term in office—a period when the legislative privilege attaches to the *entirety* of his "legislative acts." And rather than use less drastic means that might be more narrowly tailored to collecting only non-privileged information, such as issuing a subpoena or directing a search warrant for the devices of those named in the warrant who are not Members of Congress, Executive officials skipped ahead to the method *most* likely to ensnare legislative materials. Even the investigators in *Rayburn* tried alternative investigative steps before directing a search warrant at a Member's property. 497 F.3d at 656. Those here did not.

Perhaps exigent circumstances or particularly egregious criminality could explain the Executive's lack of attention to the legislative privilege. But neither defense exists here. As recently as last week, the prosecutors who sought the search

18

warrant described Congressman Ogles as a "subject" rather than a "target" of their investigation. Rowley Decl. at ¶ 10. This means that neither the Department of Justice nor the FBI "ha[s] substantial evidence linking [Congressman Ogles] to the commission of a crime." JUST. MANUAL § 9-11.151 (2020). The Congressman instead is merely a "a person whose conduct [falls] within the scope of [their] investigation." *Id.* at 11. And the crimes for which the Executive sought evidence are neither time-sensitive nor especially grave. Investigations of historical false statements are generally undisturbed by the passage of a few years, let alone the reasonable period that might be required to allow a Member to assert his legislative privilege.

Taken together, these circumstances show why the non-disclosure privilege of the Speech or Debate Clause is so important. Left unchecked, there would be nothing to stop determined Executive Branch officials from undermining Congressional independence by seizing and then examining the legislative communications of Members under the guise of search warrants directed at wrongdoing by third parties or at alleged crimes that did not occur. *See, e.g.*, *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (explaining that search warrants can be directed at the property of a person not suspected of a crime); *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (clarifying that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause").

This danger is acute for Members who find themselves opponents of the Executive Branch. Using Attorney General Jackson's language, it is fair to describe Congressman Ogles as being "unpopular" with the current President. Not only is

Mr. Ogles a Republican Member of Congress when the Executive is led by a Democrat, but he also is a member of the House Freedom Caucus, which *this* President has described as "extreme" opponents of his agenda. *See, e.g.*, Alex Gangitano*, Biden goes after Freedom Caucus in remarks on economy*, THE HILL (March 10, 2023, 12:10 PM). Plus, only days before the Executive sought the search warrants, Congressman Ogles introduced articles of impeachment against Vice President Kamala Harris, *see* Craig Shoup, *Tennessee US Rep. Andy Ogles files articles of impeachment against VP Kamala Harris*, TENNESSEAN (July 23, 2024, 4:25 PM), further demonstrating his political distance from those in the Executive Branch.

It was this sort of distance that the Founders expected to arise between the separate branches. *See, e.g.*, *Mazars*, 591 U.S. 848 (involving a Congressional subpoena for personal records of the President); *Trump v. United States*, 144 S. Ct. 2312 (2024) (involving a federal criminal prosecution of a former President). As the Supreme Court explained in *Mazars*, "Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." 581 U.S. at 866. And this rivalry is exacerbated when the "opposite and rival" political branches are also of "opposite and rival" political parties. Without a non-disclosure privilege to prevent the Executive from examining Congressional documents, the Speech or Debate Clause would leave "essentially no limits on the [Executive Branch's] power" to investigate Congress. *Id.* at 867. This result cannot be squared with the self-evident "purpose" of Clause, which "was to preserve the

constitutional structure of separate, coequal, and *independent* branches of government." *Helstoski*, 442 U.S. at 491 (emphasis added).

These separation of powers concerns underpin all the cases that have held that the Clause contains a non-disclosure privilege. Narrow instances where courts have found the Clause not to provide such a privilege were based on faulty reasoning. In *United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011), for example, the Ninth Circuit reviewed whether the Department of Justice had used evidence protected by the Speech or Debate Clause to obtain some of the non-privileged evidence it had used to prosecute former Congressman Renzi. While the Court observed the Executive Branch's legitimate interest in being able to "prosecute corrupt legislators for non-protected activity," it did not explain why the disclosure of legislative materials—which cannot be used as evidence or serve as the basis for liability—was necessary to accomplish that aim. *Id.* at 1036. Indeed, the Court avoided confronting the troubling implication of its decision: that the Executive Branch can *affirmatively* target legislative communications whenever it desires.

The Third Circuit similarly missed the mark in *In re Fattah*, 802 F.3d 516 (3d Cir. 2015), when it reasoned there could be no non-disclosure privilege because "Members could, in effect, shield themselves fully from criminal investigations by simply citing to the Speech or Debate Clause." *Id.* at 528. The non-disclosure privilege does not allow such a shield. In practice, courts oversee the process of the Member filtering legislative material, resolving any disputes about whether certain materials are legislative. And like *Renzi*, the court in *In re Fattah* fails to explain how a bar on

the disclosure of legislative materials shields a Member from liability from criminal investigations about non-legislative matters. *SEC*, 161 F.Supp.3d at 244.

These two decisions are wrong. But, even putting their flawed reasoning aside, this Court should not accept the Executive's invitation to tether Congressman Ogles' constitutional rights to a particular location. Like any core constitutional protection, the Speech or Debate Clause cannot do its job if its privileges depend on geographic happenstance. While the relief requested by his motion is an issue of first impression for this Court and the Sixth Circuit, it has been raised in, and routinely answered by, the D.C. Circuit, which has jurisdiction over the district where Congress meets. Absent extraordinary circumstances, which are not present here, this Court should be reluctant to deviate from the well-reasoned opinion of the judges who are most often called upon to decide Speech or Debate matters. And this is doubly true where, as here, the Executive Branch sought warrants outside of the District of Columbia only for strategic purposes: forum shopping at its worst. The Executive, acting through the Public Integrity Section of the Department of Justice, which sits in Washington and litigated *Perry*, knew that seizing Congressman Ogles' cell phone there would have required the Executive to apply the *Rayburn* and *Perry* safeguards. It is attempting to circumvent those protections by its efforts here.

There are few good answers for why the Executive sought warrants in Tennessee rather than the District of Columbia. To drive the point home, this investigation has nothing to do with legislative acts, and so there is not even an arguable claim that the Department of Justice or the FBI needs to see legislative

22

materials. Nothing stops the Department from following the *Rayburn* procedure in every case involving a search warrant directed at a Member of Congress and allowing the Member to remove materials its agents should not see anyway. But the prosecutors here have refused to respect the privilege. Why they want Executive officers to rummage through Congressional documents remains unknown.

Whatever that answer, this Court should not allow the Executive Branch to circumvent the Clause's non-disclosure privilege simply by choosing to execute a search warrant on a Member of Congress when he or she leaves the District of Columbia (where *Rayburn* controls). The property targeted by the warrants at issue here belongs to Congressman Ogles, who would be protected by the *Rayburn* non-disclosure privilege if the Executive sought those materials while he was in Washington. Those materials should be given the same constitutional protections when Congressman Ogles travels home. It would be of little comfort to Members, and no value as a rule of law, if legislative materials lose constitutional protection the moment they are moved outside the seat of government.

Congressman Ogles does not maintain that the Speech or Debate Clause protects unprivileged evidence or unprivileged criminal conduct. Nor does he argue that his assertions of privilege could not be judicially reviewed. Rather, he contends only that the Phone Warrant and Email Warrant are flawed—and subject to attack under Rule 41(g)—because they afforded him no opportunity to assert his legislative privilege before the Executive Branch was set to scour his records. *Cf. Rayburn*, 497 F.3d at 662. Although this Court failed to recognize the non-disclosure privilege when

it issued the warrants, it should do so now and order the return of legislative materials without further examination by the Executive Branch.

## II. The Seized Property Contains Legislative Materials.

As detailed in Congressman Ogles' declaration, both the phone and email account the Executive seized contain legislative materials. This motion does not describe the full extent of the legislative materials contained within them.[3] But that is unnecessary. If the Court determines that *any* of the contents of the phone and email are legislative materials, Congressman Ogles is entitled to review and remove those materials before Executive Branch officials access the non-privileged material, and the only question is what protocol is required to do so. Any specific disputes can be adjudicated once that protocol it complete.

Because Congressman Ogles used his cell phone and email to perform his day-to-day activities as a Member of the House of Representatives, Ogles Decl. at ¶ 7, 17, there are legislative materials on both, *see Perry*, 80 F.4th at 366 n.6  (holding that the non-disclosure privilege applies "whenever the Executive Branch searches a location where legislative materials are inevitably to be found," and that "[a] Member's cell phone is realistically such a location") (cleaned up).

"Legislative materials" is a broad term that encompasses "legislative acts undertaken within the legislative process." *Perry*, 80 F.4th at 363. When evaluating whether something is a "legislative act," courts consider whether the protection of the

---

[3]     Nor is Congressman Ogles waiving the Speech or Debate Clause privilege by disclosing the general topics of the legislative materials contained on his cellphone and email, which he must do to demonstrate standing to bring this motion.

privilege is "necessary to preserve the integrity of the legislative process," whether the "independence" of the legislature is at stake, and whether the actions at issue are things "generally done in the course of the process of enacting legislation." *Id.* at 364 (internal citations omitted).

As relevant here, the everyday documents and communications required to perform the job of a Congressman are legislative materials. They include "the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel*, 408 U.S. at 625. They also include communications within the "legitimate legislative sphere." *Eastland*, 421 U.S. at 503. Even records created "in preparation for a hearing" are legislative materials, *Schilling*, 633 F. Supp. 3d at 282, because "[t]o hold otherwise would ignore the reality of modern congressional work." *Id.* The Department of Justice itself recognizes that "legislative materials" such as these enjoy constitutional protection and, accordingly, must be treated differently than other materials for purposes of a search warrant. *See* JUST. MANUAL § 9-85.110 (2023).

That Congressman Ogles' phone and email account contain legislative materials is obvious, and such use is permitted. Members of Congress, like any other citizen, use mobile phones and email to help them do their job. Consistent with this reality, the House's rules permit the "official work of the House of Representatives" to be performed on "Members' handheld personal devices." U.S. House of Representatives, Comm. on House Admin., 118th Cong., MEMBERS' CONGRESSIONAL HANDBOOK, at 30, https://perma.cc/6EHJ-Q7KK. Similarly, the House Committee on

25

Ethics permits a Member to use a "handheld communications device" for official House matters even when it is paid for with campaign funds. U.S. House of Representatives, Comm. on Ethics, 117th Cong., HOUSE ETHICS MANUAL, at 175 (2022), at https://perma.cc/48GL-HB3A. These rules reflect the critical role such devices play in a Member's day-to-day work as a legislator. As Chief Justice Roberts explained, the modern cellphone is akin to "an important feature of human anatomy," *Riley v. California*, 573 U.S. 373, 385 (2014), which "collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record," *id.* at 394.

Congressman Ogles used his cell phone every day after his election to office, routinely texting fellow Members of Congress about the most sensitive of legislative issues, ranging from the drafting of certain bills to the most contested Speaker election since 1856. Ogles Decl. at ¶¶ 8-10. The election of the Speaker is a core constitutional mandate charged to the House of Representatives. U.S. CONST. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker."). The text messages and emails Congressman Ogles sent and received in performing that constitutionally required task are clear-cut legislative materials. Moreover, texting and emailing fellow legislators to share thoughts and opinions about pending legislation is something "generally done in the course of the process of enacting legislation." *Perry*, 80 F.4th at 364. The communications fall within the wide scope of legislative materials barred from disclosure.

Because communications on these matters are legislative materials, the Court must establish a procedure to ensure they are afforded their constitutional protection.

### III. This Court Should Provide Congressman Ogles the Opportunity to Review the Legislative Materials Before Executive Review.

Under the Speech or Debate Clause, the Court must employ a procedure providing Congressman Ogles the opportunity to remove legislative materials from the seized property before Executive review. A constitutionally sufficient procedure also will prohibit the Executive Branch from accessing the seized property until it is returned to Congressman Ogles so he can remove legislative materials before the Executive Branch reviews the non-privileged information.

Because Executive Branch officials have possession of the information contained in Congressman Ogles' cell phone and email account, and because that information includes legislative materials, this Court must order the Department of Justice to relinquish the seized materials to Congressman Ogles and his counsel, so that the Court can supervise their review and prevent disclosure of legislative materials to the Executive Branch. *See Rayburn*, 497 F.3d at 658. The Court may review the Congressman's designations *in camera*, reject any that it deems to fall outside the Speech or Debate privilege, and then return to the Executive Branch all seized materials that are not privileged. *See id.* at 661.

A similar procedure has been used to protect legislative communications in at least seven district courts across six Circuits. *See, e.g.*, *Schilling v. Speaker of U.S. House of Representatives*, 633 F. Supp. 3d 272, 274 (D.D.C. 2022); *Rangel v. Boehner*,

27

785 F.3d 19, 24 (D.C. Cir. 2015); *SEC*, 161 F. Supp. 3d at 238-46; Order, *United States v. Moussaoui*, No. 01-cr-00455 (E.D. Va. Mar. 2, 2006) (ECF No. 1642); Order, *United States v. Andersen*, No. 4:02-cr-00121 (S.D. Tex. May 14, 2002) (ECF No. 103); *United Transp. Union v. Springfield Terminal Ry. Co.*, 132 F.R.D. 4, 5-7 (D. Me. 1990); Order, *In re IBP Confidential Bus. Documents Litig.*, No. M.D.L. 428 (N.D. Iowa Sept. 29, 1981); *Stupak v. Hoffman-LaRoche, Inc.*, No. 8:05-cv-00926 (M.D. Fla. Apr. 28, 2006) (ECF No. 30).

This Court should follow their lead and order the Department of Justice to return Congressman Ogles' cell phone and email to him so that, consistent with the Speech or Debate Clause, the legislative function "may be performed independently." *Eastland*, 421 U.S. at 502.

## CONCLUSION

The Court should grant the motion and order Congressman Ogles' legislative materials be returned to him promptly, without review by the Executive.

Date: September 3, 2024

28

Respectfully submitted,

LITSON PLLC

/s/ Alex Little
J. Alex Little (No. 29858)
Zachary C. Lawson (No. 36092)
John R. Glover (No. 37772)
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co | zack@litson.co | jr@litson.co

RAYBIN & WEISSMAN, P.C.

/s/ David Raybin
David Louis Raybin (No. 3385)
424 Church Street, Suite 2120
Nashville, Tennessee 37219
Telephone: (615) 256-6666 Ext. 220
draybin@NashvilleTnLaw.com

E&W LAW, LLC

/s/ John S. Irving
John S. Irving*
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (301) 807-5670
john.irving@earthandwatergroup.com
        *Pro hac vice motion forthcoming

SECIL LAW PLLC

/s/ John P. Rowley III
John P. Rowley III*
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 642-0679
jrowley@secillaw.com
        *Pro hac vice motion forthcoming

*Counsel for Congressman Andy Ogles*

29

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of September 2024, a true and correct copy of the foregoing has been emailed to the following counsel:

Chris Suedekum
Robert Levine
Assistant United States Attorneys
U.S. Attorney's Office
for the Middle District of Tennessee
719 Church Street, Suite 3300
Nashville, TN  37203
Chris.Suedekum@usdoj.gov
Robert.Levine@usdoj.gov

John P. Taddei
Trial Attorney, Public Integrity Section
United States Department of Justice
1301 New York Avenue NW
Washington, DC 20530
John.Taddei@usdoj.gov

*/s/ Alex Little*