# UNITED STATES DISTRICT COURT

for the

__________ District of __________

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
INFORMATION ASSOCIATED WITH W[redacted]1@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC.

Case No. 24-mj-4250

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❐ contraband, fruits of crime, or other items illegally possessed;
- ❐ property designed for use, intended for use, or used in committing a crime;
- ❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1001 | False statements |
| 18 USC 1519 | Falsification of records |
| 18 USC 371 | Conspiracy |

The application is based on these facts:
See attached Affidavit in Support

❐ Continued on the attached sheet.

❐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Brent Hayden
*Applicant's signature*

Special Agent Brent Hayden, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
______________________ *(specify reliable electronic means).*

Date: July 12, 2024

*Judge's signature*

City and state: Nashville, TN

tair E. Newbern, U.S. Magistrate Judge
*Printed name and title*



Print Save As... Attach Reset

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNTS w[redacted]1@gmail.com AND [redacted] THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 24-mj-4250<br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR TWO SEARCH WARRANTS**

I, BRENT HAYDEN, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of applications for two search warrants for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachments A-1 and A-2. This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 and B-2. Upon receipt of the information described in Section I of Attachments B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2.

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since August of 2016. As a Special Agent, I have had substantial training and experience in investigating

and prosecuting public corruption and election fraud matters. In the course of my duties, I have received training in evidence handling, working with confidential informants, physical surveillance, investigating a wide variety of frauds, forfeiture, search and seizure warrants, and arrest procedures. I have executed, and have assisted other agents in the execution of, search warrants, including for information associated with email, in investigations related to public corruption, civil rights, violent crime, and crimes against children.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. As set forth in detail below, the evidence in possession of the FBI to date establishes probable cause to believe that WILLIAM ANDREW OGLES ("OGLES"), a resident of the Middle District of Tennessee, and others—including [redacted]—falsely reported making $300,000 of candidate loans to OGLES's federal campaign for the U.S. House of Representatives, in violation of 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (falsification of records), and 18 U.S.C. § 371 (conspiracy) (collectively, the "SUBJECT OFFENSES"). There is, moreover, probable cause to believe that evidence of the SUBJECT OFFENSES will be located in two Google accounts that are the subject of this affidavit:

a. "w[redacted]1@gmail.com," a Google account associated with OGLES (the "OGLES GOOGLE ACCOUNT"), as further described in Attachment A-1; and

b. [redacted]

5. The government sent preservation requests to Google for data associated with both GOOGLE ACCOUNTS on or about April 30, 2024. In or around September 2023, [redacted] for information associated with the OGLES GOOGLE ACCOUNT, [redacted], and the [redacted] In or around October 2023, the government received the requested information, and the data for those ACCOUNTS was reviewed. In or around June 13, 2024, [redacted] for additional information associated with the OGLES GOOGLE ACCOUNT. [redacted]. On or about June 28, 2024, the government received a portion of the requested information,[1] and the additional data for the OGLES GOOGLE ACCOUNT was reviewed.

**JURISDICTION**

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

---

[1] Pursuant to [redacted]

## PROBABLE CAUSE

### I. Legal Background and Summary of Investigation

7. Generally, the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30101 *et seq.* ("FECA"), limits corruption and the appearance of corruption in the election of candidates for federal office and provides for public disclosure of the financing of federal election campaigns.

8. The Federal Election Commission (hereinafter, "FEC") was a department or agency of the United States, located in Washington, D.C., with jurisdiction to administer and enforce the Election Act. The FEC was responsible for receiving and making available to the public specific, accurate information about the amounts and sources of contributions to federal candidates and political committees.

9. The Election Act and the FEC required authorized campaign committees to file periodic, accurate reports of receipts and disbursements identifying, among other things, each person that made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within, respectively, the election cycle or the calendar year, together with the date and the amount of any such contribution.

### II. OGLES's Campaign Falsely Reports $300,000 in Candidate Loans.

10. OGLES is a sitting member of the U.S. House of Representatives, representing Tennessee's 5th Congressional District, at least part of which is located within the Middle District of Tennessee. OGLES was first elected to Congress on or about November 8, 2022, and took office on or about January 3, 2023.

11. OGLES's principal federal campaign committee for the 2022 federal election cycle was Ogles for Congress (hereinafter, "the Committee").

12. On or about April 6, 2022, the Committee filed a Statement of Organization with the FEC. The Committee listed [redacted] as the campaign treasurer, [redacted].

13. [redacted].

14. [redacted].

15. [redacted].

16. [redacted].

17. On or about May 5, 2022, OGLES's campaign issued a press release claiming that the campaign had raised $453,000 in its first 30 days. On or about May 11, 2022, OGLES's

campaign website posted the press release.[2] The website included a post accompanying the release, which stated, "The Ogles campaign says none of his fundraising total came in the form of loans and that all contributions were from within Tennessee." The post also stated, "Ogles didn't officially enter the contest until the end of the Federal Election Commission's most recent reporting deadline, so he won't have to make official disclosures until July 15 — 20 days before the primary."

18. On or about July 23, 2022, the Committee filed its July 15 Quarterly Report with the FEC, covering the time period from April 1, 2022, through June 30, 2022. In the summary page of receipts, the Committee reported that it had received $247,087 in contributions and $320,000 in loans made or guaranteed by the candidate during the quarter—the first of the Committee's existence. It reported having made $58,288.39 in expenditures, for total cash on hand of $508,798.61.

19. Schedule A of the report, which listed itemized receipts, stated that OGLES made a $320,000 contribution to the Committee on April 15, 2022. Schedule C of the report, which listed loans, indicated that OGLES's contribution to the Committee was a personal loan. The Committee stated that the "Original Amount of the Loan" was $320,000, that the "Cumulative Payment to Date" was $0, and the "Balance Outstanding at Close of this Period" was $320,000, with the term of the loan incurred April 15, 2022, and due December 31, 2022.

20. OGLES electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly

---

[2] https://andyogles.com/ogles-camp-announces-453k-for-5th-district-bid-in-first-30-days/

below the signature block was a note stating, “Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109.”

21. [redacted], [redacted]. [redacted]. [redacted]

22. On or about July 23, 2022, the Committee filed its Pre-Primary Report with the FEC, covering the time period from July 1, 2022, through July 15, 2022. The Committee reported that it had received net non-candidate contributions to date of $264,402 and had net expenditures of $301,063.87. Despite reporting that it had expended more money than it had received in non-candidate contributions, the Committee was still able to report cash on hand of $283,338.13, based on the purported $320,000 loan from OGLES. OGLES electronically signed the report, certifying that he had “examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete.” Directly below the signature block was a note stating, “Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109.”

23. On or about August 4, 2022, OGLES won the Republican primary with 35.4% of the vote, with the next two candidates receiving 24.9% and 21.1%, respectively.

24. On or about August 25, 2022, the Committee filed a Statement of Organization with the FEC, replacing [redacted] as treasurer with [redacted] with the corresponding email the [redacted]. Based on my training and experience, I know that the email

account listed on a Committee's Statement of Organization will often be used for correspondence with the FEC, particularly if the FEC has questions about a Committee's filed reports.

25. On or about October 15, 2022, the Committee filed its October 15 Quarterly Report with the FEC, covering the time period from July 15, 2022, through September 30, 2022. The Committee reported $454,636 of cash on hand, including the purported $320,000 loan. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

26. On or about November 8, 2022, OGLES won the general election with 55.8% of the vote, with the next candidate receiving 42.3%.

27. On or about January 30, 2023, the Committee filed its Year-End Report with the FEC, covering the time period from November 29, 2022, through December 31, 2022. The report listed the $320,000 loan but indicated that the Committee had made no payments to OGLES, despite the due date still listed as December 31, 2022. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

28. On or about April 15, 2023, the Committee filed its April 15 Quarterly Report with the FEC, covering the time period from January 1, 2023, through March 31, 2023. The report listed the $320,000 loan under the same terms that expired December 31, 2022, with no payments made. [redacted] electronically signed the report, certifying that he had "examined [the] report

and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

29. On or about August 31, 2023, the FEC issued a Request for Additional Information ("RFAI") to the Committee. The RFAI stated, ""Your report includes loans owed to the candidate with due dates of 12/31/2022. Please note that an overdue loan from the candidate's personal funds may be considered a contribution from the candidate if new terms are not disclosed. (11 CFR § 104.3(d))."

30. On or about September 13, 2023, the Committee filed an amended April 15, 2023, Quarterly Report, changing the due date for the loan to "NONE." The report stated that the Committee had made no payments to OGLES. The amount of the loan was still listed as $320,000. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

31. On or about October 5, 2023, the FEC announced a negotiated settlement with the Committee for a financial penalty of $5,750 based on reporting errors and FECA violations during the 2021-22 federal election cycle. The cited errors included, among other items: the failure to file and late filing of reports; excessive, prohibited, and other impermissible contributions/transfers; and failure to provide supporting schedules. The FEC's Reports Analytics Division ("RAD") additionally referred the Committee for amending its 2022 October Quarterly Report on January 5, 2023, to disclose additional receipts, totaling $89,877.25, and for the failure to timely file 48-Hour Notices for the 2022 primary election, totaling $15,800, and for the 2022 general election,

totaling $13,700. Nothing in the settlement addressed the purported $320,000 loan or otherwise indicated that, at the time, the FEC was aware of any inaccurate statements related to it beyond the original repayment term expiring.

32. On or about May 22, 2024, the Committee filed at least 11 amended reports with the FEC, dating back to the July 2022 Quarterly Report in which the Committee first reported that it had received $320,000 in candidate loans. The amended reports reduced the amount of candidate loans from $320,000 to $20,000. The reports also reduced the Committees cash on hand amounts reflected in each report by approximately $300,000. [redacted] electronically signed the Reports, certifying that he had "examined [the] report[s] and to the best of [his] knowledge and belief [they are] true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

33. On or about May 23, 2024, OGLES issued the following public statement, in which he admitted that, for years, the Committee has falsely inflated loans that it had received from OGLES by $300,000:

a. "At the beginning of the 2022 campaign cycle, I pledged $320,000 to use toward my own campaign efforts if needed. I'm not a wealthy man who can self-fund the millions of dollars needed to run a congressional campaign. I am a grassroots representative, and I pledged everything I own to run for the honor of representing Tennessee's Fifth Congressional District. That $320,000 pledge comprised several documented assets, including bank and retirement accounts, which I was ready to personally risk for the chance to fight for Middle Tennessee. While we only needed to transfer $20,000, unfortunately, the full amount of my pledge was mistakenly

included on my campaign's FEC reports. The amendments we filed yesterday were done in consultation with attorneys and FEC reporting experts to begin the process of ensuring my FEC reports and Financial Disclosures accurately reflect the circumstances of my original pledge. I will always be a representative of the people, and I will never stop fighting to champion their conservative cause."[3]

**III.** [redacted].

34. On or about January 30, 2023, and May 15, 2023, OGLES filed mandatory financial disclosures with the U.S. House of Representatives. OGLES listed some investment properties and retirement accounts, but no other assets or interest-bearing bank accounts that could support the purported $320,000 loan to the Committee.

35. I have reviewed [redacted]

36. On or about April 14, 2022, [redacted]

---

[3] https://x.com/andyogles/status/1793703913876783529

37. On or about October 13, 2022, [redacted] was an aide to OGLES's campaign and is the current chief of staff of OGLES's congressional office.

38. As stated previously, on or about July 23, 2022, the Committee filed its July 15 Quarterly Report with the FEC. This report covered April 1, 2022, through June 30, 2022. According to the report, the Committee claimed to have received $247,087 in net contributions and $320,000 in candidate loans. It reported $58,288.39 in net expenditures, and $508,798.61 in cash on hand. Those reported figures are [redacted]

39. On or about July 23, 2022, the Committee filed its pre-election report for the period of July 1, 2022, through July 15, 2022. According to the filing, cash on hand was $283,338.13. That reported figure [redacted]

40. On or about January 30, 2023, the Committee filed its Year-End Report with the FEC for the time period of November 29, 2022, to December 31, 2022. According to the filing, cash on hand was $397,586.84. [redacted]

41. On or about April 15, 2023, the Committee filed its April 15 Quarterly Report with the FEC for the time period of January 1, 2023, to March 31, 2023. According to the filing, cash on hand was $361,567.45. [redacted]

42. On or about September 13, 2023, the Committee filed an amended April 15 Quarterly Report with the FEC for the time period of January 1, 2023, to March 31, 2023. According to the filing, cash on hand was $398,139.29. [redacted]

43. During the time periods discussed above, [redacted]

## IV. **<u>OGLES's and [redacted] Uses of the GOOGLE ACCOUNTS and Communications in Furtherance of the Scheme</u>**

44. As described above, the OGLES GOOGLE ACCOUNT is the email account associated with the Committee's [redacted].

45. OGLES also used the OGLES GOOGLE ACCOUNT to [redacted].

46. As described above, the [redacted] has been the primary email account associated with the Committee since on or about August 25, 2022.

47. Moreover, [redacted] during the lifecycle of Ogles's 2021-22 campaign and continuing through April 2024.

48. [redacted]

[redacted]

49. [redacted]

a. From on or about July 21 through on or about July 23, 2022—the timeframe prior to and including the filing date of the original July 15, 2022 Quarterly Report, in which the Committee first reported the purported $320,000 loan from OGLES, as well as the filing date of the original 2022 Pre-Primary Report—[redacted].

b. From on or about October 10 through on or about October 22, 2022—a timeframe encompassing the filing date of the original October 15, 2022 Quarterly Report—[redacted]

c. From on or about January 15, 2023, through on or about January 31, 2023—a timeframe encompassing the filing date of the Committee's 2022 Year-End Report, which falsely listed the $320,000 loan and indicated that the Committee had made no payments to OGLES, despite the due date still listed as December 31, 2022—[redacted]

d. During April 2023—a timeframe encompassing the filing date of the Committee's April 15 Quarterly Report, which falsely listed the $320,000 loan under the same

terms that expired December 31, 2022, with no payments made—[redacted]

e. During July 2023—weeks before the FEC issued a RFAI to the Committee on or about August 31, 2023, drawing OGLES's and [redacted] attention to the terms of the purported loans that OGLES had made to the Committee—[redacted]

f. [redacted] around the times of the Committee's regular FEC filings, [redacted] the FEC's August 31, 2023 RFAI and the Committee's September 13, 2023 response, in which the Committee, under [redacted] signature, filed an amended April 15, 2023, Quarterly Report, changing the due date for the loan to "NONE" while still falsely listing the amount of the loan as $320,000.

g. During October 2023—a timeframe encompassing the FEC's announcement of a negotiated settlement with the Committee for a financial penalty based on reporting errors and FECA violations during the 2021-22 federal election cycle—[redacted]

h. During April 2024—weeks before the Committee filed the amended Reports with the FEC reducing the amount of candidate loans from $320,000 to $20,000 and OGLES issued the statement admitting that the Committee has falsely inflated loans that it had received from OGLES by $300,000 for years—[redacted]

[redacted]

**BACKGROUND CONCERNING GOOGLE**[4]

50. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

51. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

---

[4] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

52. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

53. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

54. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

55. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

56. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

57. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

58. Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

59. Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts

the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

60. Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

61. Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact

retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

62. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

63. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

64. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

65. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.

As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

66. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

67. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For example, a list of apps might reveal banking institutions used by the targets. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

68. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**CONCLUSION**

69. Based on the forgoing, I request that the Court issue the proposed search warrant.

70. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A-1

**Property to Be Searched**

This warrant applies to information associated with the Google account "w[redacted]1@gmail.com" ("the Account") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B-1

**Particular Things to be Seized**

**I. Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on April 30, 2024, with the Google Reference Number 59159492, Google is required to disclose to the government for each account or identifier listed in Attachment A-1 the following information from January 1, 2022 to present, unless otherwise indicated:

a. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3. Telephone numbers, including SMS recovery and alternate sign-in numbers;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

6. Length of service (including start date and creation IP) and types of service utilized;

7. Means and source of payment (including any credit card or bank account number); and

8. Change history.

b. All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c. Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs;

d. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

e. Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

f. Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

g. The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

h. The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

i. The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

j. All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history;

k. All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history; and

l. All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (falsification of records), and 18 U.S.C. § 371 (conspiracy) (collectively, the "SUBJECT OFFENSES"), those violations involving WILLIAM ANDREW OGLES, [redacted], and/or [redacted] and occurring after January 1, 2022, including, for each Account or identifier listed on Attachment A-1, information pertaining to the following matters:

a. Information concerning Ogles for Congress (hereinafter, "the Committee");

b. Information concerning financial support for the Committee;

c. Information concerning the reports filed by the Committee with the Federal Election Commission (hereinafter, "the FEC");

d. Information concerning OGLES's personal and business finances;

e. Information concerning OGLES's financial disclosures filed with the U.S. House of Representatives;

f. Communications between OGLES, [redacted] [redacted] and/or other individuals identified in the search warrant affidavit concerning political contributions and financial support for the Committee;

g. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation described in the affidavit; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

h. Information that constitutes evidence indicating the state of mind of the user of the Account, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

i. Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the user of the Account;

j. All information, including the content of communications, that constitutes evidence of the criminal activity under investigation;

k. Steps taken in furtherance of the criminal activity under investigation;

l. Any and all evidence indicating in any way a motive to commit any the offenses detailed in this affidavit; and

m. The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by [[**CHOOSE APPLICABLE:** Google LLC **AND/OR** Google Payment Corporation]] ("Google"), and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google. The attached records consist of ______________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b. such records were generated by Google's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

______________________ ____________________________________

Date Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT w[redacted]11@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 24-mj-4250<br><br>**Filed Under Seal** |

**APPLICATION FOR ORDER COMMANDING GOOGLE LLC NOT TO NOTIFY ANY PERSON OF THE EXISTENCE OF WARRANT**

The United States requests that the Court order Google LLC ("Google") not to notify any person (including the subscribers and customers of the account(s) listed in the warrant) of the existence of the attached warrant for a period of one year from the issuance of the requested order.

Google is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Pursuant to 18 U.S.C. § 2703, the United States obtained the attached warrant, which requires Google to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.*

In this case, such an order would be appropriate because the attached warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly,

there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation or unduly delay a trial, including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses. *See* 18 U.S.C. § 2705(b). Some of the evidence in this investigation is stored electronically. If alerted to the existence of the warrant, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

WHEREFORE, the United States respectfully requests that the Court grant the attached Order directing Google not to disclose the existence or content of the attached warrant for a period of one year, except that Google may disclose the attached warrant to an attorney for Google for the purpose of receiving legal advice.

The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Executed on July 12, 2024______.

/s/ Robert S. Levine_______________

ROBERT S. LEVINE
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT w[redacted]1@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 24-mj-4250<br><br>**Filed Under Seal** |

**ORDER**

The United States has submitted an application pursuant to 18 U.S.C. § 2705(b), requesting that the Court issue an Order commanding Google LLC ("Google"), an electronic communication service provider and/or a remote computing service, not to notify any person (including the subscribers and customers of the account(s) listed in the warrant) of the existence of the attached warrant until one year from the date this order is issued.

The Court determines that there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation or unduly delay a trial, including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, or intimidate potential witnesses. *See* 18 U.S.C. § 2705(b).

IT IS THEREFORE ORDERED under 18 U.S.C. § 2705(b) that Google shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, for a period of one year from the date this order is issued, except that Google may disclose the attached warrant to an attorney for Google for the purpose of receiving legal advice.

IT IS FURTHER ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

July 12, 2024

Date

ALISTAIR E. NEWBERN
United States Magistrate Judge